UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:13CR471 JAR |
| | ) | |
| MARCUS TERRELL STOKES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b).   The Defendant filed a motion to suppress statements and evidence, and the Government filed a response thereto.   On January 13, 2014, the undersigned ordered that the evidentiary hearing be held on February 18, 2014, however, due to a scheduling conflict, the hearing was reset to February 25, 2014.  Based upon the evidence adduced at the hearing on the motion to suppress, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Sean Applegate is a detective with the Bellefontaine Neighbors Police Department.  On September 26, 2013, Applegate was investigating a case involving the Defendant Marcus Terrell Stokes.  In that case, Stokes' ex-wife had alleged that someone was sending her threatening and racially charged emails which were causing her a great deal of fear and anxiety.  One of the people she mentioned as a possible source of the emails was her ex-husband, Marcus Stokes.

On September 26, 2013, Applegate and FBI Special Agent Cerone went to the Defendant's place of business.  They had learned that the Defendant was employed at Commercial Platings

Company on Riverview Boulevard in St. Louis, Missouri.  Applegate and Cerone went to these premises and knocked on the door.  They were shortly escorted inside an office area.  In this area, they identified themselves as police officers and agents, and asked to speak to Mr. Stokes.  Shortly after this, they were shown by an employee of the company to Commercial Platings' conference room.  The conference room contained an oblong table with a few chairs around the table.  There were no windows in the conference room.  Shortly after they arrived in the conference room, the Defendant entered the room and had a seat next to the door.  The agents identified themselves to the Defendant and told him that they were there investigating a series of threatening emails that had been sent to his ex-wife.  They told him that he was a potential source of the emails.  He was told at the beginning of the interview that he did not have to participate in the interview, that he was not in custody, and was free to leave the interview at any time he desired to do so.  Nevertheless, the Defendant agreed to talk to the agents.

During the interview, the Defendant told Applegate that he, too, had received the same threatening communications on his Smart phone.  He stated that he had the phone with him at work, and offered to retrieve the phone so that Applegate could view the threatening messages.  Applegate told him that he would like to see the phone, and the Defendant left the conference room, and shortly returned with the cell phone, giving it to Applegate. The Defendant in essence was telling Applegate that he, too, was the victim of these threatening emails.  After handing the phone to Applegate, he gave Applegate the code to open up the phone.  Applegate then, after entering the code, attempted to retrieve the messages, however, he could not do so either because of the way the phone was configured or lack of signal strength on the business premises.

At this point, Applegate asked Stokes if he could take the cell phone with him, and have it examined by experts who would be able to retrieve the messages from the phone. Stokes told Applegate that he could have permission to take his phone and search it, and signed a handwritten consent form which states that the Bellefontaine Neighbors police department and the FBI had Stokes' permission to search the phone. Stokes, however, did tell Det. Applegate that he needed his phone by the end of the day, and was really interested in receiving the phone back because it had all of his information contained on it. Applegate told the Defendant that he would make every effort to return his phone, however, Applegate told him that he was not in total control over the phone nor when and how it would be returned from the expert. No threats or promises were made to the Defendant in order to obtain his permission to search the phone, and the interview was quite cordial. The Defendant appeared to be interested in cooperating with the agents in their investigation. The interview itself lasted approximately a maximum of forty-five (45) minutes. The Defendant never refused to answer any questions or asked to leave the interview.

After the interview, Applegate took the phone to the Regional Computer Crimes Education & Enforcement Group in Clayton, Missouri. He dropped off the phone so that it could be imaged and searched by the computer group. At about 3 p.m. that same day, he received a call from a detective at the computer enforcement group. The detective told him that he had retrieved three threatening communications from the phone, and that Stokes' phone appeared to be the original source of the threatening communication. At this point, although Applegate had every intention of returning the phone to the Defendant on that same day, nevertheless, determined that he would not do so. He did not return the phone because he seized the phone as evidence since he believed it had been used as an instrumentality to commit the crime of sending threatening communications.

The next morning, at about 8:30 a.m., Applegate and Cerone again went to the Defendant's place of business. Applegate wanted to tell the Defendant why they had seized his phone, and what they had found on it. When they encountered the Defendant, his demeanor was quite different than it was the day before. He was angry with the agents for not returning his phone, and demanded its return to him. Applegate explained to the Defendant why his phone had not been returned, and that it had been seized as evidence in the case. This interview lasted only about ten minutes, because the agents had nothing more to impart to the Defendant nor he to them.

Starting at about Noon on September 27, 2013, Applegate began to receive phone calls from the Defendant at the Bellefontaine Neighbors Police Department. When he and the Defendant finally made contact, the Defendant told Applegate that he wanted to talk him about his cell phone, and that he needed to obtain his cell phone in order to obtain his contacts. Applegate told the Defendant he would not talk to him on the phone, that if he wanted to talk to him about the case, he should come to the station. Approximately an hour later, the Defendant arrived at the station. Applegate placed him in an interview room at that time. Prior to the interview starting, Applegate had the following discussion with the Defendant:

> All right Marcus, you're here voluntarily. You can get up and leave any time you want. You're not in custody. So what do you want to talk to me about?

The Defendant then shortly asked Applegate about what evidence he had against the Defendant, telling Applegate that he did not have any paperwork or documents that were evidence. Applegate then told the Defendant that he, Applegate, was not required to tell him anything, and the Defendant was on a fishing expedition trying to get information about the case. Applegate told the Defendant he was interested in hearing a truthful explanation from the Defendant and did not need the Defendant to feed him "bullshit," since he already had the evidence that he needed to convict the

4

Defendant. He told Stokes that he could talk to him, but if he talked to him, he needed to tell Applegate the truth. At this point, Stokes began to admit that he had sent threatening communications to his ex-wife, but only because she was "threatening" or "messing with" him also. In essence, his explanation was, "She was trying to play me, so I was going to play her."

## Conclusions of Law

<u>Statements of the Defendant</u>

The Defendant alleges that he was in custody for the purposes of <u>Miranda</u>. Therefore, he alleges that his statement was illegally taken from him because his <u>Miranda</u> rights were not given to him and he did not waive his rights voluntarily. Based on the above findings, the undersigned, however, concludes that the statements made by the Defendant both on September 26 and 27, were non-custodial, voluntary statements and should not be suppressed.

In determining whether the Defendant was in custody, the Court must consider whether under the totality of the circumstances, the officers deprived him of his freedom in any significant way, and if a reasonable person under similar circumstances would believe that he was under arrest, or that his movement was significantly restricted. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984).

In <u>United States v. Rorex</u>, 737 F.2d 753 (8th Cir. 1984), the defendant was interviewed by FBI agents at his place of business while a search warrant was being executed at that business. Approximately three agents were involved in conducting the interview while the others were seizing alleged stolen property at the defendant's business premises. The defendant was not advised of his rights, however, he was not taken into custody at the end of the interview. In delineating the standard

5

to be followed as to whether or not the defendant is in custody for purposes of Miranda, the Court stated as follows:

> The warnings required by *Miranda* are required only in situations involving custodial interrogation. . .The fact that an investigation may be said to have focused on a particular person does not necessarily make questioning custodial. . .Thus, in order to determine what constitutes custody for purposes of requiring *Miranda* warnings prior to the questioning of an individual, one must look at the totality of the circumstances involved.  Relevant factors include, but are not limited to:  (1) the scene of the interview; (2) the subjective intent of the officer in question, *i.e.*, did the officer intend to hold the individual in custody or to arrest him at the conclusion of the interview, (3) the age and experience of the person interviewed, and (4) the mode and manner of questioning, *i.e.*, was the design and tone of the questioning "such as to overbear the free will of the defendant."

737 F.2d 753, 755, 756.

Further, in United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990), the Court added the factors of (1) whether or not the defendant was informed at the time of questioning that he was free to leave or request the officers to do so, and (2) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions. See Griffin, 922 F.2d, 1343, 1349.

The Eighth Circuit has also recognized that formal arrest is the final indicia of being in custody.  In United States v. Czichray, 378 F.3d 822 (8th Cir. 2004), the Court stated as follows:

> The ultimate question in determining whether a person is in "custody" for purposes of *Miranda* is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."  *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).  The "only relevant inquiry" in considering that question is how a reasonable person in Czichary's position would have understood his situation.

378 F.2d 822, 826.

Given the above, the undersigned concludes that the Defendant was not in custody on any of his three encounters.  The Defendant was interviewed on the first two occasions at his place of

6

business in a normal business conference room not a police dominated atmosphere. He was told prior to each interview, including the one at the police station, that he was there voluntarily, that he could "get up and leave" any time he wanted, and that he was not in custody. In addition, the final police station interview took place at Defendant's request and not the request of the officer. The Defendant desired to ask questions about his cell phone and came to the police station of his own accord to do so. Once there, he was told that he was free to leave at any time he so desired. Further, no strong-arm tactics were used or employed by the police, nor did they use any subterfuge. In addition, the interviews were relatively short, the longest one lasting about an hour and the shortest ten minutes. And, as stated, the final interview which lasted an hour was initiated at the Defendant's request. Further, the officer had no intention of arresting the Defendant at the end of the interviews, and did not do so. At the end of each interview, he left of his own accord. Therefore, the undersigned concludes that the Defendant was not in custody for purposes of being given his Miranda warnings.

The Defendant also contends that the statements were not voluntarily made. However, based on the above findings, the undersigned concludes that the Defendant's statements both to the agents and the police officer were voluntary and should not be suppressed. Although Det. Applegate did tell the Defendant that he believed that he was not telling the truth, and that he needed to answer his questions truthfully or he did not want to listen to him, the undersigned concludes that the Defendant's will was not overborne and that his statements were nonetheless voluntary. See United States v. Meirovitz, 918 F.2d 1376 (8th Cir. 1990) (a police officer's statement "it is in your best interest to cooperate" did not vitiate the voluntariness of a confession). In commenting on the appropriate test in certain situations, the Court stated as follows in United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995):

> The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's "'will [was] overborne and his capacity for self-determination critically impaired.'" . . .In making this determination, courts will inquire into the totality of the circumstances in assessing the conduct of law enforcement officials and the suspect's capacity to resist any pressure. . .

58 F.3d 350, 353.

The Supreme Court has stated that the factors to be considered in determining whether the defendant's will was overborne include: the youth of the accused; his lack of education or his low intelligence; lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; the use of physical punishment such as deprivation of food or sleep. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). Furthermore, false statements made to a defendant stating that a co-defendant had confessed implicating a defendant have been held to be insufficient to overcome the voluntariness of a confession. See Frazier v. Cupp, 394 U.S. 731, 738 (1969); Evans v. Dowd, 932 F.2d 739 (8th Cir. 1991) (police officer falsely telling a defendant that they had an eyewitness of him committing a crime did not vitiate voluntariness). Further, a defendant's confession after statements were made to the defendant that he could help himself by cooperating, that his cooperation would likely result in a more lenient sentence, or that he faced severe penalties and that full cooperation was the best course of action have been held not to vitiate voluntariness. See United States v. Meirovitz, supra; United States v. Alvarado, 822 F.2d 645 (2nd Cir. 1989); United States v. Leon Guerrero, 847 F.2d 1363 (9th Cir. 1988).

Based on the above, the undersigned concludes the Defendant's statements both at the place of business and the police station were voluntarily made. The Defendant was never, on any occasion, coerced nor were strong-arm tactics used against him. He was not threatened in any manner nor was he promised anything to obtain his statements. The most that happened was that he was told by Det.

Applegate that he did not believe he was telling him the truth and that he needed to tell the truth in this matter. In essence, Applegate told him that he knew what the truth was and he was not interested in any of the Defendant's false explanations. After this, the Defendant immediately started making admissions to Applegate. This type of statement made to the Defendant has been held in the past not to vitiate the voluntariness of statements. See United States v. Meirovitz, supra; United States v. Alvarado, supra; United States v. Leon Guerrero, supra. The undersigned concludes that this is the case in the matter at bar. The Defendant is 33 years old and has a wife and child; the Defendant is gainfully employed and appears to be of normal intelligence; the Defendant was not in custody at the time of any of these encounters, and, in fact, for his encounter at the police station voluntarily appeared in order to talk to the officer about the matter. The Defendant evinced a completely cooperative manner with the officers and wanted to explain his side of the situation and to document it. Therefore, based on all of the above, the undersigned concludes that the totality of the circumstances show the Defendant's statements to be voluntarily made and they should not be suppressed.

Consent to Search

The undersigned concludes that the consent to search Defendant's cellular telephone for the threatening messages pursuant to the Defendant's oral and written consent was lawful.

Police officers may search premises, vehicles, or items such as cell phones if they obtain consent to do so from someone who has authority over the item. Further, a consent is lawful if it is voluntary and the product of free choice, not given under duress or coercion. Voluntariness is a question of fact to be determined by the totality of the circumstances present. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Matlock, 415 U.S. 164 (1974). Among the

9

factors to be considered in determining whether consent was voluntary include the following: whether the person who consented was detained and questioned for a long or short period of time before granting consent; whether the person was threatened, physically intimidated, or punished by police; whether the defendant relied on promises and representations made by police to grant consent; whether the defendant was in custody or under arrest when consent was given; whether the consent was given in a public or a secluded place; whether the defendant objected to the search or stood silently by while the search occurred; the age of the defendant; the general intelligence of the defendant; whether the defendant was intoxicated or under the influence of drugs; whether the defendant consented after being informed of his right to refuse consent; and whether, because the defendant had been previously arrested, he was aware the protection afforded suspected criminals by the legal system.  See United State v. Willie, 462 F.3d 892 (8th Cir. 2006); United States v. Chaidez, 906 F.2d 377, 381, 382 (8th Cir. 1990).

Given the above factors, the undersigned concludes that the consent was given voluntarily. Initially, the undersigned notes that the Defendant brought up the fact that he had received the same threatening communications on his cell phone, and that he had his cell phone at work and would be happy to allow the agents to view it in order to verify his claims.  Thus, it was the Defendant who first brought up the cellular telephone and the Defendant who said he had the cellular phone with him and that it could be searched. After the cell phone was retrieved by the Defendant and the agent could not immediately find or download the emails which the Defendant referenced, he asked  the defendant for permission to take the cellular telephone to an expert so it could be examined and the emails could be accessed.  The Defendant agreed to a full search of the cellular telephone without limitation both in writing and otherwise.  The only thing that the Defendant requested was that the cellular telephone

10

be returned to him by the end of the day after the search was completed. Thus, as to the search of the phone itself, the undersigned concludes that the Defendant was not detained or in custody at the time of his consent; he was not under arrest; he was not threatened or promised anything; no strong-arm tactics were used; the Defendant was 33 years of age, was married, and had a child; the Defendant was gainfully employed; the Defendant's attitude was quite cooperative; he did not appear to be under the influence of alcohol or drugs, and the consent took place at his place of business, which, although in a conference room, was nevertheless not secluded or sequestered from the business. For the above reasons, as in Willie and Chaidez, supra, the undersigned concludes that the consent to search the cellular telephone was voluntarily given.

Further, the undersigned concludes that having found after examination pursuant to Defendant's consent that the threats on the cellular telephone were in fact not threats made to the Defendant but likely were the source of the threats made to the complaining witness, the Government had probable cause to seize the cellular telephone as evidence of a crime. They could do this because the threatening messages were in plain view to the officer during their lawful search of the cellular phone, and it would have been apparent to the expert searching the phone they were the likely source of the threats. Therefore, pursuant to this doctrine the phone may be seized because it contained evidence of criminal activity. See Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971).

## Conclusion

Therefore, the undersigned finds that the evidence seized from the Defendant and the statements made by Defendant should not be suppressed.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress Statements and Evidence [ECF No. 21] be **denied**.

Further, the parties are advised that they have fourteen (14) days, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).


    /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  11th  day of April, 2014.